In re David G. **CALVERT** and Sandra M. Calvert, Debtors.

**Wil L. FORKER, Trustee, Plaintiff–Appellee,**

v.

**DUENOW MANAGEMENT CORPORATION, Defendant–Appellant.**

No. 98–6037NI.

United States Bankruptcy Appellate Panel of the Eighth Circuit.

Submitted Oct. 27, 1998.

Decided Nov. 30, 1998.

KOGER, Chief Judge.

Duenow Management Corporation ("Duenow") appeals the decision of the bankruptcy court finding that a pre-petition transfer made to Duenow by the debtors was avoidable under 11 U.S.C. § 547 and ordering that the trustee, Wil L. Forker, recover from Duenow $8,875.00 plus the costs of the action.

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(b) and (c).

## FACTUAL BACKGROUND

On March 5, 1997, David G. Calvert and his wife, Sandra Calvert, filed a joint Chapter 7 petition in bankruptcy. Prior to that time, David Calvert had been a manager of a Kentucky Fried Chicken outlet located in Sioux City, Iowa, which was owned by Duenow. Calvert lost his job with Duenow in November 1996 because Duenow believed he had embezzled money from it. Calvert settled Duenow's claim against him in December 1996 for the sum of $11,844.90.

In December 1996, David Calvert borrowed $12,000.00 from his parents for the purpose of paying the settlement to Duenow. Specifically, on December 18, 1996, David Calvert's mother delivered $12,000.00 in cash to Calvert's wife, Sandra, who purchased a cashier's check in the amount of $11,844.90 with those funds. The cashier's check was made payable to the Calverts' attorney, Mr. Golby Uhlir. That same day, Sandra took the cashier's check to Mr. Uhlir, who used that check to purchase a money order in the same amount. Mr. Uhlir remitted the money order to Duenow in settlement of the claim.

Also on December 18, 1996, David and Sandra Calvert executed a "Mortgage Note" in favor of David Calvert's parents promising to repay $11,884.90.[2] They also gave Calvert's parents a mortgage against their home to secure the loan. Finally, the Calverts purportedly gave David's parents a lien on their 1992 Ford Ranger pickup truck. No

Jeffrey L. Poulson, Sioux City, IA, for Appellant.

Wilford L. Forker, Sioux City, IA, for Appellee.

Before KOGER, Chief Judge, KRESSEL and MAHONEY,[1] Bankruptcy Judges.

---

1. The Honorable Timothy J. Mahoney, Chief Judge, United States Bankruptcy Court for the District of Nebraska, sitting by designation.

2. There has been no explanation for the discrepancy between the amount loaned, the amount of the Mortgage Note and the amount of the check payable to Duenow.

security agreement regarding the pickup was offered into evidence, but a copy of the Certificate of Title was admitted showing the notation of a lien in favor of David Calvert's father, Glen Calbert [sic].

The evidence at trial showed that the Calverts' house was valued at $52,755.00. However, the bankruptcy court concluded that after considering the first and second mortgages on the house, the taxes payable on the house, and the escrow account balance, the debtors had only $17.17 equity in the house as of December 1, 1996, a little more than two weeks prior to giving David Calvert's parents the mortgage on the house.

The 1992 Ford Ranger pickup was valued at $8,875.00 and was unencumbered.

The debtors made the payment to Duenow, gave David Calvert's parents the mortgage on their residence, and had the lien noted on the Certificate of Title to the pickup all within ninety days prior to the filing of the bankruptcy petition and while the debtors were insolvent. As a result, the trustee filed an action to recover the payment to Duenow as a preferential transfer under § 547(b).

Duenow responded that the earmarking exception to § 547(b) applied because the funds loaned to the debtors by David Calvert's parents had been earmarked for Duenow. The trustee contended that the earmarking doctrine did not apply because the debtors gave security for the loan to David Calvert's parents, whereas the debt to Duenow had not been a secured debt. Thus, according to the trustee, the security interest exception to the earmarking doctrine applied and as a result, the transaction was an avoidable preference.

The bankruptcy court found that because there was no equity in the residence (and thus the estate was not diminished as a result of giving the mortgage on the residence), the earmarking doctrine applied to the part of the debt represented by the mortgage on the residence. Consequently, it was not recoverable as a preference under § 547(b).

However, the court found that the earmarking doctrine did not apply to the part of the debt represented by the lien on the pickup because the parents received a valid security interest for that portion of the loan. In other words, the court agreed with the trustee's assertion that the security interest exception to the earmarking doctrine applied as to the portion of the debt to the parents which was secured by the pickup. Thus, the trustee could avoid that part of the payment made to Duenow which represented the value of the pickup, or $8,875.00, and Duenow was ordered to remit that amount to the trustee. Duenow appeals this part of the bankruptcy court's Decision.

For the reasons that follow, we believe the bankruptcy court erred in finding that the trustee met his burden of proving that the debtors gave a valid security interest in the pickup truck to David Calvert's parents. As a result, the security interest exception to the earmarking doctrine does not apply. Consequently, because the earmarking doctrine applies, the trustee is not entitled to recover the payment to Duenow as a preference under § 547(b). We therefore reverse the Decision of the bankruptcy court.

## STANDARD OF REVIEW

▮ We review the bankruptcy court's findings of fact, whether based upon oral or documentary evidence, for clear error, and review legal conclusions *de novo.* Fed. R.Bankr.P. 8013; *First National Bank of Olathe v. Pontow,* 111 F.3d 604, 609 (8th Cir.1997); *Chamberlain v. Kula (In re Kula),* 213 B.R. 729, 735 (8th Cir. BAP 1997).

## DISCUSSION

Section 547 of the Bankruptcy Code permits the trustee to recover certain payments made to creditors shortly prior to filing the bankruptcy petition. Section 547(b) requires that in order for a transfer to be subject to avoidance as a preference:

(1) there must be a transfer of an interest of the debtor in property;

(2) on account of an antecedent debt;

(3) to or for the benefit of a creditor;

(4) made while the debtor was insolvent;

(5) within 90 days prior to the commencement of the bankruptcy case;

(6) that left the creditor better off than it would have been if the transfer had not been made and the creditor had asserted its claim in a Chapter 7 liquidation.

*Buckley v. Jeld–Wen, Inc. (In re Interior Wood Prods. Co.)*, 986 F.2d 228, 230 (8th Cir.1993); 11 U.S.C. § 547(b). The parties dispute the existence of only the first requirement, namely, that there was a transfer of an interest of the debtor in property in the first place. Specifically, the parties dispute whether an exception to § 547(b), the earmarking doctrine, applies so as to remove the payment to Duenow from the reaches of § 547(b).

 "The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a 'transfer of an interest of the debtor in property'." *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561, 565 (8th Cir.1988). In order to satisfy the earmarking doctrine, the transaction must meet three requirements: (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt; (2) performance of that agreement according to its terms; and (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate. *Id.* at 566. If the earmarking doctrine applies, no avoidable transfer is made because the loaned funds never become part of the debtor's property. *See In re Interior Wood Prods.*, 986 F.2d at 231. There is no preference if the new creditor is merely substituted for the old creditor. *Id.* at 231, 232.

 However, the earmarking doctrine applies only if the new and old creditor enjoy the same priority. *See Kaler v. Community First Nat'l Bank (In re Heitkamp)*, 137 F.3d 1087, 1089 (8th Cir.1998). Hence, the earmarking doctrine applies when a security interest is given for funds used to pay secured debts, but not when a security interest is given for funds used to pay an unsecured debt. *Id.; Brown v. Mt. Prospect State Bank (In re Muncrief)*, 900 F.2d 1220, 1224 n. 4 (8th Cir.1990). If this "security interest" exception applies, the transfer is not earmarked and is therefore avoidable to the extent the transfer depleted the debtor's estate or "to the extent of the value of the collateral given up by the estate to secure the loan." *Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067, 1071 (6th Cir.1987) (*citing Virginia Nat'l Bank v. Woodson (In re Decker)*, 329 F.2d 836, 839–40 (4th Cir.1964)). The trustee bears the burden of proving that the earmarking doctrine does not apply, *see In re Heitkamp*, 137 F.3d at 1089, and thus bears the burden of proving the security interest exception does apply.

In the case at bar, the trustee argued before the bankruptcy court that the security interest exception applied because the debtors had given David Calvert's parents a security interest in the pickup truck.[3] In determining whether David Calvert's parents received a security interest in the pickup truck, we look to Nebraska law, as did the bankruptcy court.

Under Nebraska law, in order for a security interest to attach to goods, such as a vehicle, and to be enforceable against a third party, the collateral must either be in the possession of the secured party or the debtor must have "signed a security agreement which contains a description of the collateral." Neb.Rev.Stat. U.C.C. § 9–203(1)(a) (1997). There is no dispute that the pickup in this case is not and was not in David Calvert's parents' possession, so in order to establish that the parents have a valid security interest in the pickup, the trustee must demonstrate that there was a signed security agreement containing a description of the pickup truck.

No written security agreement was offered into evidence at trial. The only written evidence tending to suggest that the debtors had given a security interest in the pickup to David Calvert's parents was the notation of David Calvert's father as lienholder on the Certificate of Title. The Certificate of Title

---

**3.** The parties do not dispute that the residence has no equity, so the mortgage given against it did not cause the estate to be diminished. Because the only dispute here involves the security interest given in the pickup truck, we limit our discussion to that issue.

also bears the county clerk's signature and seal. The bankruptcy court essentially found that this was sufficient, under Nebraska law, to establish that the debtors had given David Calvert's parents a valid security interest in the pickup.

■ Under Neb.Rev.Stat. § 60–110, where title to a vehicle is issued, perfection of a security agreement is accomplished by notation of the lien on the certificate of title. According to that statute:

> The holder of a security agreement, trust receipt, conditional sales contract, or similar instrument, upon presentation of such instrument to the county clerk of the county where such certificate of title was issued or, if issued by the department, to the department together with the certificate of title and the fee prescribed by section 60–115, may have a notation of such lien made on the face of such certificate of title. The county clerk or the department shall enter the notation and the date thereof over the signature of such officer or deputy and the seal of office and shall also note such lien and the date thereof on the duplicate of same on file. If noted by a county clerk, he or she shall on that day notify the department which shall note the lien on its records. The county clerk or the department shall also indicate by appropriate notation and on such instrument itself the fact that such lien has been noted on the certificate of title.

Again, the Certificate of Title herein shows the notation of the father's lien, as well as the signature and seal of the county clerk. Thus, since there was no evidence of a written security agreement in this case, the issue here is whether the lien notation on the Certificate of Title (which constitutes perfection of the security interest) can create a presumption that a written security agreement exists. The bankruptcy court held that it did.

As the bankruptcy court pointed out, the Nebraska Supreme Court has held:

> [I]n the absence of evidence to the contrary, the law presumes official acts of public officers in a collateral attack thereon to have been done rightly, and with authority, and that in such a collateral attack acts done which presuppose the existence of other acts to make them legally operative are presumptive proof of [the existence of such other acts].

*Majerus v. School Dist. No. 52 of Richardson County*, 139 Neb. 823, 299 N.W. 178, 179 (Neb.1941); *accord Bissel v. Fletcher*, 27 Neb. 582, 43 N.W. 350, 351 (Neb.1889); *Hamilton County v. Thomsen*, 158 Neb. 254, 63 N.W.2d 168, 173–74 (Neb.1954); *Sherard v. State of Nebraska*, 244 Neb. 743, 509 N.W.2d 194, 198 (Neb.1993) ("[i]n the absence of evidence to the contrary, we presume that official acts, including ministerial acts, have been properly performed").

Under this authority, commonly referred to as the "official acts presumption," in the event of a collateral attack against the validity of the county clerk's lien notation, the court could apply what the cases above refer to as a "presumption" that the lien is valid and that the clerk had been presented with a security agreement (or other appropriate document) at the time he noted the lien on the title.[4] The bankruptcy court here held that this official acts presumption applied in this case so as to create a presumption that the Calverts had presented the county clerk with a security agreement when he noted the lien on the Certificate of Title. It then held that Duenow's evidence was insufficient to rebut that presumption. We believe this holding was erroneous for two reasons.

First, we believe this holding by the bankruptcy court was error because although the *Majerus* court, as well as the Nebraska cases applying the *Majerus* doctrine, have all referred to that doctrine as a "presumption," we question whether the doctrine announced in *Majerus* is actually a presumption at all. We believe that because it has been mislabeled as a presumption, it has therefore been misused by some courts.[5]

■ "A true presumption is a device whereby an ultimate fact (the presumed fact)

---

4. Because we decide this appeal on other grounds, we need not discuss whether a "trust receipt, conditional sales contract, or similar instrument" as specified in § 60–110 could constitute a "security agreement" as is required in Neb.Rev.Stat. U.C.C. § 9–203(1)(a).

5. Several scholars have expressed their frustration over the common misuse of so-called "pre-

may be assumed through the proof of one or more other facts (the basic facts)." G. Michael Fenner, *About Presumptions in Civil Actions,* 17 Creighton L.Rev. 307, 314 (1984); Fenner, *Presumptions: 350 Years of Confusion and It Has Come to This,* 25 Creighton L.Rev. at 389. If the *Majerus* doctrine, or the "official acts presumption," were a true presumption, it would be governed by Rule 301 of the Nebraska Rules of Evidence, which shifts either the burden of persuasion or the burden of production, or both, to the party who wants to overcome the presumption. *See* Fenner, *About Presumptions,* 17 Creighton L.Rev. at 309, 314.

██ It is our opinion that the "official acts presumption" is not a true evidentiary presumption whereby a party (here, the trustee) trying to prove the ultimate fact (the existence of a security agreement) can meet his burden by proving another fact (the notation of the lien on the title). Rather, we believe the doctrine announced in *Majerus* is a rule of law intended to protect public officials when their official acts are attacked, whether collaterally or otherwise. In other words, under the proper application of this doctrine, in the event the validity of the lien notation is attacked, the notation of the lien will, as a matter of law, be considered legitimate and the burden of proof will be on the challenger of the validity of the lien to prove facts establishing that the lien is invalid.

Here, because the acts of the county clerk are not at issue, the rule of law intended to protect the clerk's acts, the *Majerus* rule, does not come into play. We believe the so-called "presumption" was never intended to protect or aid a party, such as the trustee herein, in attempting to prove the existence of a security agreement and to shift the burden to the other party to prove that no security agreement existed. Thus, we believe the trustee in this case was not entitled to the benefit of this rule of law and the bankruptcy court should not have applied a presumption which shifted the burden to Duenow to rebut it.

██ Alternatively, even assuming the "official acts presumption" is a true evidentiary presumption as the Nebraska courts have implied, it only comes into play in the event of a collateral attack against the validity of the lien. Thus, the first issue under that analysis, and we believe the determinative issue in this case, is whether the trustee's attack against Duenow under § 547 is a collateral attack against the presumption of validity of the county clerk's lien notation on the Certificate of Title. This is the crucial question because if this is not a collateral attack against the validity of the lien, the official acts presumption does not apply.

In its Decision, the bankruptcy court held that this dispute involved a collateral attack against the validity of the lien. In so holding, the court suggested that a dispute between the trustee and David Calvert's parents over the enforceability of the lien would be a direct attack, as would an action by the trustee or the debtor against the county to have the notation removed. However, the court concluded that because this proceeding was one by the trustee against a stranger to both the title and the lien, it was a collateral attack upon the validity of the lien. Thus, according to the bankruptcy court, the trustee was entitled to the benefit of the official acts presumption as stated by the Nebraska Supreme Court in *Majerus.*

We disagree with this conclusion by the bankruptcy court. Essentially, the bankruptcy court concluded that because this dispute did not involve a direct attack against the validity of the lien, it must be a collateral attack. To the contrary, we believe there is no attack, either direct or collateral, against the validity of the lien. Thus, the official acts presumption does not even come into play.

The trustee bears the burden of proving that the earmarking doctrine does not apply.

---

sumptions." According to one, "the only sensible solution to the 'problem of presumptions' is to stop using the term and to face directly whatever evidentiary issues may be posed for resolution by our system of adjudication." Ronald J. Allen, *Presumptions in Civil Actions Reconsidered,* 66 Iowa L.Rev. 843, 862–63 (1981) (*quoted by* G. Michael Fenner, *Presumptions: 350 Years of Confusion and It Has Come to This,* 25 Creighton

L.Rev. 383, 396 (1992)). We hope that by offering this rather limited discussion of the issue we have not joined the legion of "text writers, authors of legal articles, teachers of law, courts and legislatures [who] 'have written much and clarified little' [on the subject of presumptions]." Fenner, *350 Years of Confusion,* 25 Creighton L.Rev. at 396 (*quoting TePoel v. Larson,* 236 Minn. 482, 53 N.W.2d 468, 470 (Minn.1952)).

*See In re Heitkamp,* 137 F.3d at 1089. Thus, the trustee must prove that the security interest exception to the earmarking doctrine applies. This requires the trustee to prove that the debtors gave David Calvert's parents a valid security interest in the truck, and this, in turn, requires the trustee to prove the debtors gave the parents a signed security agreement containing a description of the pickup as collateral. *See* Neb.Rev. Stat. U.C.C. § 9–203(1)(a).

It is important to note here that what is being proven at this point is the *existence* of a security agreement—no one is suggesting at this point that the lien is invalid. Because no one is *attacking* the validity of the lien at this point, the official acts presumption is not yet evoked. Yet this is where the bankruptcy court applied it: the court applied the presumption for the benefit of the trustee in meeting his burden of proving a valid security interest existed and then found that Duenow's evidence was insufficient to rebut that presumption.

In contrast, we believe that because no one has yet attacked the validity of the lien, the trustee must first prove the existence of a security agreement using affirmative evidence and independently of the official acts presumption. If he had met the burden by using affirmative evidence and Duenow challenged that evidence (thereby attacking the validity of the lien), *then* the presumption would apply. At this point, however, the trustee must prove the existence of a security agreement using evidence and without the benefit of any presumption.

Consequently, because the trustee is not entitled to a presumption that the debtors had signed a security agreement containing a description of the pickup, we look to the evidence presented at trial to determine whether there was sufficient evidence to support the contention that such a security agreement ever existed. After carefully reviewing the transcripts and documentary evidence, we believe the evidence was plainly insufficient to prove the existence of a security agreement. In fact, the trustee produced essentially no evidence, other than the lien notation on the title, to support the allegation that there had been a security agreement regarding the truck.

Again, no written security agreement was offered into evidence. Furthermore, not a single witness testified to the existence of a security agreement. Specifically, the attorney who represented the Calverts in settling the matter with Duenow and who arranged the transaction between the Calverts and David's parents, Mr. Uhlir, testified in a deposition which was received in evidence at trial that he had prepared a note and mortgage on the real estate and that he directed the parties to record the lien on the title to the truck, but he did not indicate he had prepared a security agreement on the truck. Mr. Uhlir testified that in addition to copies of the cashier's check and money order, he had in his possession a "mortgage note;" a second real estate mortgage document; a handwritten note showing the total amount loaned and the parents' names, address, birthdays and social security numbers; and a copy of the title to the pickup with the lien notation. All of these documents were before the trial court and none of them even remotely resemble a security agreement regarding the pickup. The bankruptcy court inferred from Mr. Uhlir's testimony that he did not prepare a security agreement, and we believe the court was correct in so concluding.

We are thus left with the proposition that the Calverts prepared a valid security agreement on their own, without Mr. Uhlir's assistance. We believe the evidence does not support such a proposition, particularly considering the fact that Mr. Uhlir had prepared all of the other documentation regarding the transaction, including those documents necessary to create a mortgage on the residence which had no equity. Moreover, there was absolutely no evidence that the Calverts created and signed a security agreement. Although not specifically asked whether he signed a security agreement on the truck, David Calvert testified that in order to give his parents a security interest in the pickup, he simply delivered the title to them so that they could go get the lien noted thereon. Furthermore, Sandra Calvert testified that she had signed "some notes giving David's mother a mortgage on the house and promising to pay" which had been prepared by Mr. Uhlir. She also indicated that she and her

husband had given the title to David's parents for them to hold, but she never mentioned a security agreement regarding the pickup.

We find this evidence is simply not enough to meet the trustee's burden of proving the existence of a signed security agreement regarding the truck. As a result, the trustee failed to prove that the debtors gave the parents a security interest in the truck. He therefore failed to prove the earmarking doctrine did not apply. The bankruptcy court should have found, therefore, that the earmarking doctrine applied, the payment to Duenow (from the funds loaned by the parents) was never property of the debtors' estate, and thus it was not an avoidable preference under § 547(b).

Because we believe the bankruptcy court incorrectly applied the official acts presumption to find that the debtors had given a valid security interest in the pickup truck to David Calvert's parents, it erred in finding that the earmarking doctrine was inapplicable. Because the funds had been earmarked, the payment to Duenow was not an avoidable preference. We therefore reverse the Decision of the Bankruptcy Court and remand for entry of judgment consistent with this ruling.